UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
            v.                    )
                                  )     CRIMINAL NO. 04-30019-MAP
                                  )
ROBERT KNOWLES,                   )
            Defendant             )

## GOVERNMENT'S AMENDED RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

The United States of America, by Michael J. Sullivan, United States Attorney for the District of Massachusetts, respectfully submits the following amended opposition[1] to the Defendant's motion to suppress physical evidence - including a firearm and ammunition - seized from the Defendant's residence on April 21, 2004. Additionally, the government opposes the Defendant's motion to Suppress Statements made to law enforcement.

## STATEMENT OF ISSUES

There are two issues before this Court:

1.   Whether the search warrant established probable cause to believe that the Defendant had committed a crime and that evidence of the crime was likely located in the mobile home in which the Defendant lived.

---

[1]The undersigned Assistant U.S. Attorney unintentionally omitted a statement of the case in the government's response.

1

2.    Whether the Defendant made a valid waiver of his

Miranda rights before he made statements to the police.

## STATEMENT OF THE CASE

On April 15, 2004, a federal grand jury returned an indictment charging Robert Knowles with being a felon in possession of a firearm and ammunition in violation of 18 United States Code, Section 922(g)(1).  The firearm and ammunition specified in the indictment were seized during a search of a mobile home located at 49 Quaboag Valley Co-op in Three Rivers, Massachusetts.  That search was conducted pursuant to a search warrant issued by Janet H. Austin, First Assistant Clerk Magistrate of the Palmer District Court.  The Defendant made statements to the police inside the mobile home, and then later at the Palmer Police Station.  On December 1, 2004, the Defendant moved to suppress the evidence seized during the search, as well as the statements made to the police.

## STATEMENT OF FACTS

### A.    The Search Warrant

On April 21, 2003, Janet A. Austin, the Palmer District Court First Assistant Clerk-Magistrate, issued a warrant authorizing the search of "49 Quaboag Valley Co-op, Three Rivers, MA.  A yellow vinyl sided mobile home with a car port and enclosed porch . . . "  The application in support of the search warrant was supported by the affidavit of Palmer Police Sergeant

2

Christopher Burns ("Burns").  After listing his experience in law enforcement, Burns described how on April 18, 2004, Raymond Frazier ("Frazier") called 911 to report that Robert Knowles ("Knowles") had choked him and threatened to shoot him. [Aff. ¶ 3].[2] Frazier told the responding police officer, that same evening, that Knowles, an acquaintance, physically assaulted him, threatened to shoot him, and threatened to kill his parents. [Id.].

The affidavit then details how Burns conducted the follow-up investigation. Burns interviewed Frazier at the Palmer Police Station on April 20, 2004.  [Aff. ¶ 4] In his statement to Burns, Frazier provided the following description of Knowles' assault April 18, 2004:

> "When I turned on the inside light Bobby looked right
> at me.  He opened the front door and walked right up
> the stairs toward me at a fast pace.  I did not tell
> Bobby to come in to the house, he just opened the door
> and walked right in.  When Bobby met me at the top of
> the stairs he immediately grabbed my throat with his
> right hand and was squeezing my adams apple.  At the
> same time he covered my mouth with his left hand so I
> couldn't speak.  Bobby walked me forcefully into the
> kitchen still holding me in the same manner.  He pushed
> me against the wall and held me there.  As I tried to
> pull away from Bobby he squeezed my throat.  While he
> was holding my throat I could not breath.  Bobby pushed
> his chest against me and held me against the wall with
> all of his weight.  Bobby kept holding his left hand on
> my mouth.  He let go of my throat with his right hand
> and dropped his hand to his right side.  When Bobby
> raised his hand back up he was holding a grayish
> colored handgun that looked like a 9mm.  Bobby held the

_____

[2]The citation "[Aff.___]" refers to Burns' affidavit, which is <u>Exhibit 1</u> of Defendant's submission.

3

gun right up to my forehead and started threatening me.
The gun was about two inches from my forehead.

Bobby told me that I owe him money for the court
incident with Jerusa.  He said that if I didn't pay it
he was going to have to.  Bobby Knowles told me that he
could kill me right here and watch my brains go all
over the place.  Bobby then said that he would go in my
parents room and kill them so that there are no
witnesses.  Bobby said that he would then move out of
town and no one would ever know.  Bobby also said that
he was going to do this to me if I didn't pay him
$700.00 for the court thing with Jerusa.  Bobby said
that if I don't pay him this money by Monday he was
going to come to my work and kill me.  He told me that
if he didn't find me at work he would come to my house
and kill me.  He kept repeating over and over again
that he would kill me.  Bobby kept his hand over my
mouth and then put the gun away and put his hand on my
throat again.  He would tighten his grip to the point
that I couldn't breath.

Bobby told me that his partner in crime was waiting
outside for him.  He told me that this person just got
out of prison and that he and this person have been
"boys" since he (Bobby) was in prison.  Bobby told me
that if I go to the police about this and he gets
arrested, His partner in crime will kill me."

[Aff. ¶ 7-9].

According to Frazier, Knowles assaulted him because Frazier

had not paid Knowles' portion of a restitution amount in a

criminal matter.  [Aff. ¶ 12].  This restitution was ordered "by

the court" for a crime they committed together, referred to as

the "Jerusa" incident.  Frazier described the Jerusa incident to

Burns as follows:

"The Jerusa incident that I have been referring to
happened in February of 2002.  I think it was February
22, 2002.  Jerusa was a friend of mine, I think she is
about 18.  She lived in Granby back in February of
2002.  Back in February Jerusa had asked me to come

4

over her house to party. I went to her house with
Bobby Knowles, My brother Joel and my friend Danny
Webb. Bobby brought Jerusa some alcohol and we all
hung out there. While we were there Bobby started
stealing tools and Bow's and arrows from the house. I
turned in to a whole big mess and we were all charged
by the Granby police for breaking and entering and a
few other things. When this case went to court we were
all ordered to pay $1400.00 dollars to the court for
restitution. We were supposed to split the cost
between us all. This is why Bobby knowles wants money
from me. I have already paid the court about $250.00"
[Aff. ¶ 12].

Frazier told Burns that he was very afraid of Knowles, as he
knew Knowles to be a very violent individual, who was skilled in
"Karate and Ti kick boxing." [Aff. ¶ 10]. Frazier expressed
first-hand knowledge of Knowles violent nature, by describing an
incident in which Frazier had seen Knowles physically beat an
acquaintance named Danny Webb. [Id.]. Frazier also described a
past incident - providing Burns with the approximate date,
location, and a description of the firearm - during which Knowles
had threatened him with a firearm. [Aff. ¶ 14].

Frazier also knew Knowles to frequently possess firearms,
and to keep firearms in his residence. He provided his first-
hand observations of mobile home that Knowles stayed in, as well
as the firearms, to Burns in detail:

"I have been over Bobby Knowles trailer at 49 Quaboag
Valley co-op in Three Rivers several times since I met
him. Bobby lives there with his girlfriend Linda
Barron, she actually owns the trailer. Shortly after I
met Bobby Knowles I was over his trailer playing video
games with him in his bedroom. I got up to use the
bathroom and then came back in the room. When I came
back in Bobby showed me two hand guns. The guns he
showed me were a grayish color (similar to the color of

Sgt. Burns' gun) 9mm handgun and a .45 caliber handgun that was gray with gold grips. Bobby told me that these guns were his. We were in his bedroom when he showed me the guns. Bobby has the bedroom that is at the back of the trailer. He and Linda do not share a bedroom. After showing me the guns Bobby left them on the dresser. This incident occurred shortly after I met him." [Aff. ¶ 13].

Frazier told Burns that he had been known Knowles for about three years. [Aff. ¶ 4]. During that time, Frazier admitted to committing crimes with Knowles, mostly breaking and entering into area homes in order to steal items. [Aff. ¶ ¶ 14 and 17]. Frazier provided the approximate dates and locations of the break-in sites, and told Burns that he and Knowles had stolen firearms on at least two occasions. [Id.].

**B.  The Search**

Sergeant Burns, along with several other officers, executed the search warrant at approximately 3:00 a.m. on April 21, 2004. After gaining entry, Burns placed Knowles under arrest, provided him with a copy of the search warrant, and informed him of his Miranda rights. At that time, Knowles stated, "[T]his is about that fucking faggot piece of shit Ray Frazier isn't it?" Burns informed Knowles that he would have the opportunity to speak later, and asked him if he had any handguns in the home. Knowles replied "No, I don't have no fucking guns, go ahead and look wherever you want." Knowles continued, without being prompted, and said "That fucking piece of shit Ray Frazier is doing this isn't he?" When Burns reminded Mr. Knowles of his Miranda

rights, Knowles said "I know my rights and I don't need no fucking piece of shit lawyer! I was home all night Friday night, that fucking Ray Frazier is a liar!" When Burns told Mr. Knowles that he had not mentioned anything about Friday night, Knowles stated, "That's what this is about, right? That fucker said I went over his house and put a gun to his fucking head?"

A short time after Knowles stated that he did not have a gun in the house, Officer Melnick ("Melnick") informed Burns that he found a small safe hidden under Knowles' bed. Knowles stated that the safe belonged to him, though he denied having a key to open the safe. Knowles then stated, "[M]aybe one of the keys on the dresser would open it." Melnick was unable to open the safe with the keys. A short while later the officer forced the safe open with a pry bar. Upon opening the safe Melnick discovered a handgun (a 9 mm Lorcin semi-automatic) and an ammunition magazine loaded with 10 rounds 9mm ammunition. The firearm matched the description of the firearm described in the search warrant. The safe also contained a box of Winchester .410 caliber ammunition. Knowles denied ownership of the firearm at this time.

Approximately three hours later, at the Palmer Police Station, Knowles signed a written waiver of his Miranda warnings, and gave a statement to Burns.[3] In this statement, Knowles admitted owning the firearm the police had recovered from his

---

[3] See Government's <u>Exhibit A</u> (attached)

7

bedroom.

**SUMMARY OF ARGUMENT**

This Court should deny the Defendant's Motion to Suppress Physical Evidence because the search warrant affidavit provided probable cause to believe that the Defendant had committed a crime and that evidence of the crime likely would be located at the place to be searched.  The informant's first-hand observation of criminal activity, the specific details he provides to the affiant, and the statements he makes against his own penal interests, combined with the affiant's corroboration of the informant's information, should lead this Court to conclude the magistrate had a substantial basis for concluding probable cause existed to search the Defendant's bedroom.

This court should also deny the Defendant's Motion to Suppress Statements, since the Defendant knowingly, voluntarily, and intelligently, waived his Miranda rights.

**ARGUMENT**

**1.   The Search Warrant Affidavit Established Probable Cause To Believe That The Defendant Assaulted Raymond Frazier With A Firearm, And That The Firearm Would Be Recovered From The Defendant's Residence**

An affidavit in support of a search warrant must, given the "totality of the circumstances," demonstrate probable cause the search will uncover criminal activity.  <u>United States v. Khounsavanh</u>, 113 F.3d 279, 283 (1st Cir. 1997) citing <u>Illinios v.</u>

8

_Gates_, 462 U.S. 213, 238 (1983).  The probable cause standard, however, is not based on a certainty that evidence will be uncovered; instead, the affidavit must show "a fair probability that contraband or evidence of a crime will be found in a particular place." _Khounsavanh_ 113 F.3d at 283 citing _Gates_, 462 U.S. at 238.  Probable cause will be found if the affidavit provides "cause to believe that a particular person has committed a crime - - "the commission element" - - _and_ that enumerated evidence relevant to the probable criminality likely is located at the place to be searched - - "the nexus element"." _United States v. Zayas-Diaz_, 95 F.3d 105, 110-111 (1st Cir. 1996).

The decisions of the First Circuit point to a "non-exhaustive" list of factors magistrates should consider when evaluating whether an affidavit provides probable cause.  _See_, _United States v. Strother_, 318 F.3d 64, 68 (2003); _Khounsavanh_, 113 F.3d at 284; _Zayas-Diaz_, 95 F.3d at 111.  This list of factors include (1) the credibility and reliability of the informant (the veracity element), (2) the underlying circumstances from which the informant concluded there was criminal activity (basis-of-knowledge), (3) whether the informant made any self-authenticating statements, and (4) whether the police corroborated factual statements made by the informant. _Zayas-Diaz_, 95 F.3d at 111.  Furthermore, because a determination of probable cause requires evaluating the "totality of the

circumstances," an affidavit that provides weak evidence on one of these factors may be compensated by other stronger evidence. Id. See Khounsavanh, 113 F.3d at 285(no one factor in an affidavit possesses "talismanic powers" in showing probable cause).

The magistrate's decision to issue a search warrant is a "common sense" decision. Strother, 318 F.3d at 67. Largely, this is because the magistrate's inquiry is fundamentally fact-specific. Khousavanh, 113 F.3d at 285. Consequently, a magistrate's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 citing Spinelli v. United States,393 U.S. 410, 419 (1969); see Strother, 318 F.3d at 67. The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding probable cause existed. Gates, 462 U.S. at 238 citing Jones v. United States, 362 U.S. 257, 271 (1960).

**A. Raymond Frazier's Information - Garnered Through His First-Hand Knowledge - Is Sufficiently Reliable To Serve As The Basis For Probable Cause In The Search Warrant Affidavit**

Sergeant Burns' affidavit relies on an informant, Raymond Frazier, to establish a substantial basis for probable cause of criminal conduct and the nexus between the conduct and the place to be searched. Contrary to the Defendant's assertion, Burns sets forth more than a mere conclusion of Raymond Frazier's

10

reliability in his affidavit.  While an informant's reliability is often bolstered by prior accurate information provided by that informant, <u>United States v. Schaefer</u>, 87 F.3d 562, 566 (1st Cir. 1996), prior use of an informant is not the only method of determining informant reliability.  <u>*United States v. Scalia,*</u> 993 F.2d 984, 987 (1st Cir. 1993)(stating that a warrant affidavit need not contain an averment of previous reliability).  The appropriate inquiry in deciding whether a search warrant amounts to probable cause is whether the informant's present information is truthful or reliable.  <u>United States v. Cochrane</u>, 896 F.2d 635, 641 (1st Cir. 1990) citing <u>United States v. Harris</u>, 403 U.S. 573, 581-82 (1971).  Although Raymond Frazier had not previously served as an informant, other indicia of reliability exist in Burns' affidavit from which this Court can evaluate Frazier's information in making a reliability assessment.

The first indication of Frazier's reliability is his status as an identified informant, as opposed to an anonymous tipster.  <u>See</u> <u>United States v. Link</u>, 238 F.3d 106, 110 (1st Cir. 2001) citing <u>Florida v. J.L.</u>, 529 U.S. 266 (2000)  <u>See also</u> <u>Scalia</u>, 993 F.2d at 987 (court affords more weight to identified 911 caller in probable cause determination).  That he was a named source allowed at least two law enforcement officers[4] to assess Frazier's demeanor, as well as the information he provided.

---

[4] Sergeant Burns (the affiant) and Officer Rebecca Lukaskieewicz (the officer who responded to Frazier's 911 call).

Link, 238 F.3d at 110.  Furthermore, because he was named and
known to the police, Frazier risked being held responsible, by
the police, if the information he provided turned out to be
fabricated.  Florida v. J.L., 529 U.S. at 270; see United States
v. Barnard, 299 F.3d 90, 92 (1st Cir. 2002).  It is also
significant that Frazier was receiving no consideration - either
financial or criminal - in exchange for his information.
Barnard, 299 F.3d at 92.  Here, the reasonable inference is that
Frazier was motivated by fear.  This fear is amply articulated in
Burns's affidavit, including Frazier statement that "[During the
time that all of this [Knowles' assault] was going on I truly
believed that Bobby was going to kill me.  I have never been so
scared in my life.  I believed that Bobby was going to shoot me."
[Aff. ¶ 9].

     This initial presumption toward reliability is strengthened
by the resolute nature of Frazier's reporting.  Frazier reported
Knowles' assault three times in less than 24 hours.  Frazier
first called 911, then provided a statement to the responding
officer, and finally, Frazier provided a lengthy statement to
Burns at the Palmer Police Station.  By identifying himself, and
standing firm with his account of the assault, Frazier
demonstrated that he had carefully considered the consequences of
his actions, both with the police and the Defendant.  See, e.g.
United States v. Jenkins, 313 F.3d 549, 554-55 (10th Cir.
2002)(although informant declined to give last name,

                              12

circumstances of repeated discussions with police, including two face-to-face meetings, provided disincentive for making false accusations). This degree of deliberation demonstrated by Frazier minimized the chance of false reporting, born of momentary passion or personal animus. Frazier reasonably believed that law enforcement would likely respond to his allegations by, at the very least, approaching Knowles, and confronting him with the accusations. [Aff. ¶ 9]. It was reasonable for Sergeant Burns, and the magistrate, to draw the conclusion that it would be very unlikely for Frazier to repeatedly fabricate his account of Knowles' assault and the likelihood that Knowles possessed a firearm, at the risk of angering Knowles, since Knowles was a former acquaintance with a substantial criminal record of violence. These presumptions of accountability and reliability inherent to Frazier's statement by virtue of his being named, and not receiving any consideration, are significantly bolstered by Frazier's basis of knowledge.

Frazier's detailed description, based on his first-hand knowledge, of both the commission of the crime, and the crime's nexus to the place to be searched, should be considered self-authenticating in this Court's probable cause determination. The high degree of specificity and detail with which Frazier described the crime alleged (the assault with the firearm), the place to be searched (the mobile home), and the item to be seized (the firearm) is compelling evidence, and a strong indication of

Frazier's reliability. United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched or the items to be seized.") citing United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990) see also Gates, 462 U.S. at 233 (strong basis-of-knowledge can overcome concerns of the lack of an informant's prior service to law enforcement).

Frazier's role as the actual victim of Knowles' physical assault, in addition to his unique relationship as a close friend and former criminal accomplice to Knowles, enabled him to provide a high level of detail, based on his personal knowledge, of all the material facts necessary for probable cause, as well as the Defendant's propensity for violence, history of possessing a firearm, and motive for the assault.  See United States v. Cochrane, 896 F.2d 635, 641 (1st Cir. 1990)(citing United States v. Harris, 403 U.S. 573 (1971), noting that "an important indicia of reliability is the fact that the informant's knowledge was based on personal observation rather than hearsay").  The immediacy, detail, and depth of Frazier's basis-of-knowledge provide intrinsic support for the reliability of the information, allowing Burns and the magistrate to attribute significant weight to Frazier's statements.  Gates, 462 U.S. at 233. ("explicit and detailed description of alleged wrongdoing, along with a

statement that the event was observed first-hand, entitles his [informant's] tip to greater weight"); Scalia, 993 F.2d at 987 (an informant's wealth of detail regarding suspect's premises supported veracity of information); Taylor, 985 F.2d at 6.

As the victim of the crime alleged, Frazier provided a first-hand, detailed description of Knowles' very personal, and recent assault. Frazier described the manner in which Knowles grabbed and choked him, the threats that Knowles made, and the actual firearm that Knowles brandished. [Aff. ¶ ¶ 7 - 9]. The degree of detail conveyed by Frazier to Sergeant Burns, serves to authenticate the assault's occurrence. Taylor, 985 F.2d at 6. Scalia, 993 F.2d at 987.

Frazier's knowledge of Knowles' living arrangement, and Knowles' history of possessing firearms is equally convincing. The affidavit contained Frazier's detailed description of the Defendant's address, a description of the premises, that the Defendant lived with his girlfriend, Linda Baron, that Baron owned the trailer, and the location of the Defendant's bedroom in the trailer. [Aff. ¶ 13].

Frazier recounted how, on several occasions, Frazier visited the trailer in which Knowles lived. [Id.] During one such visit, Knowles showed Frazier two handguns that he [Knowles] kept in his bedroom. [Id.] This first-hand information provided a strong link between Knowles' assault of Frazier with the firearm, and the mobile home, the likely location where Knowles stored his

firearms.  Barnard, 299 F.3d at 4.

Frazier also described in detail how Knowles had illegally possessed firearms, in Frazier's company, on several other occasions, even providing descriptions of the various firearms. [Aff. ¶ ¶ 13 and 14].  Although the Defendant may assert that Frazier's criminal history is detrimental to his credibility, it is his criminal history that puts Frazier in a unique position, as a criminal coconspirator, from which he can credibly provide details about Knowles' criminal activity.  It is unlikely that a law-abiding citizen could possess this level of detailed information or authenticity.

Frazier's self-incriminating statements, contained in the affidavit, also serve to bolster his reliability.  United States v. Schaefer, 87 F.3d 562, 566 (1996).  See also Cochrane, 896 F.2d 635, 640-41 (1990) (rejecting the District Court's determination that the informant's reliability was scarce because the informant admitted he violated the law and noting, instead, Chief Justice Burger's language in Harris, 403 U.S. at 583, that "people do not lightly admit a crime and place critical evidence in the hands of police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility -- sufficient at least to support a finding of probable cause to search." ). Frazier detailed how he and Knowles broke into the home of Ryan Martin on Breckenridge Street in March 2001.  Aff. ¶ 14].  During

16

this crime, Frazier described how Knowles was in possession of a handgun and the purpose of the break-in was to acquire additional handguns known to be kept in this home. [id.]. Furthermore, this was not the only time Knowles and Frazier participated together in criminal activity. The affidavit states, "[o]ver the last two years I have broken into at least 3 or 4 houses and possibly more with Bobby Knowles." Aff. ¶ 17]. These homes were located in Brimfield, Belchertown, and Bondsville, MA. Aff. ¶ ¶ 17 and 18]. In addition, Frazier stated he and Knowles stole a DVD player, jewelry, credit cards, money, paint ball equipment and guns. [Id.] These statements are clearly against Frazier's penal interest and therefore, add to Frazier's veracity as an informant. <u>Schaefer</u>, 87 F.3d 562, 566.

Frazier's detailed account laid a strong foundation for satisfying both the commission and nexus elements of the probable cause inquiry. By corroborating key details of Frazier's statement, Burns established probable cause with his affidavit.

**B.  Burns Corroboration Of Significant Facts From Frazier's Statement Provided Substantial Basis For Crediting Frazier's Statement To A Degree Sufficient To Support Probable Cause.**

Burns' affidavit contains corroboration of important, material facts provided by Frazier. Most significantly, Burns summarized Knowles' criminal history, which revealed that:

    A.  Knowles had been convicted of at least two offenses involving a firearm;

B.   Knowles had been convicted of at least three violent offenses, including assault with a firearm, and assault and battery by means of a dangerous weapon;

C.   Knowles had been convicted on four occasions for escape.

In light of Frazier's statement that Knowles possessed a firearm, and was violent, the materiality of these prior convictions to the probable cause determination that Knowles illegally possessed a firearm, and assaulted Frazier with the firearm, is obvious and significant.  Strother, 318 F.3d at 68; Taylor, 985 F.2d at 6-7; United States v. Asselin, 775 F.2d 445, 446 (1985).  Knowles' criminal background information not only supports the conclusion of criminal activity, but also upholds the reliability of Frazier's statements.  Khousavanh, 113 F.3d at 284; Barnard, 299 F.3d at 92.  In addition to Frazier's claims that Knowles possessed a firearm and was violent, his convictions for escape corroborate Frazier's claims that Knowles had been imprisoned.  [Aff. ¶ 9].

Burns provided the number of times Knowles was arraigned as an adult (forty-five) and the number of times Knowles was arraigned as a juvenile (seventy-three).  [Aff. ¶ 21].  Because, Knowles is a previously convicted felon, a fact that Burns learned upon reviewing Knowles' criminal record, Knowles' possession of a firearm is evidence of a crime.  Strother, 318 F.2d at 68-69.  Furthermore, Burns learned that Knowles did not possess a license to carry a firearm.  [Aff. ¶ 23].

18

Burns also corroborated Frazier's information concerning
Knowles' address, including the facts that Knowles' girlfriend,
Linda Baron, lived with Knowles, and that Baron was the owner of
this property.  [Id.].  Burns provided a detailed description of
the location of the mobile home including the layout of the roads
and a description of the residence.  [Aff. ¶¶ 22 and 23].
Although this information was not criminal in nature, the
corroboration is still significant in demonstrating Frazier's
reliability.  Draper v. United States, 358 U.S. 307, 313
(1959)(all of the corroborating detail established was of
entirely innocent activity).

Burns' corroboration sufficiently minimized the risk that
Frazier's information was inaccurate or misleading.  For purposes
of assessing probable cause, it is enough that "corroboration
through other sources of information reduced the chances of a
reckless or prevaricating tale, thus providing a "substantial
basis for crediting the hearsay." Gates, 462 U.S. at 244-45
quoting Jones v. United States, 362 U.S. at 269; Khounsavanh, 113
F.3d at 284 (the risk that an informant is lying or in error need
not be wholly eliminated).

It was neither necessary nor practical for Burns to
corroborate Frazier's accusations with direct evidence of Knowles
guilt, for example to catch Knowles with a firearm on his person.
Probable cause to search a residence requires only a probability
or substantial chance, not an actual showing, that contraband or

19

evidence of a crime will be found.  <u>Gates</u>, 462 U.S. 238-239.

Furthermore, Burns' level of corroboration of material facts bears directly on Frazier's reliability and lends great credence to the statements which Burns could not verify independently - that Knowles assaulted Frazier with a firearm, and that the firearm was located in Knowles' trailer.  <u>See</u> <u>United States v. Soule,</u> 908 F.2d 1032, 1039-40 (1990) quoting <u>Alabama v. White</u>, 496 U.S. 35, (1990) ("Gates gave us the proposition that because an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity") citing <u>Gates</u>, 462 U.S. at 244.

Sergeant Burns' own professional assessment of probable cause is an important factor a magistrate must consider in proceeding with a search warrant.  Burns has sixteen years of law enforcement experience and special training in investigations. [Aff. ¶ ¶ 1 and 2].  Burns' request to enter Knowles' apartment in the early morning hours, showed the magistrate that Burns believed Knowles to be armed and dangerous.  [Aff. ¶ 27].  In addition, the very length of Frazier's statement to Burns, a four-page single-spaced written statement, could reasonably lead a magistrate to infer that Sergeant Burns had time to evaluate Frazier, and the substance of his statement, and had deemed Frazier's information reliable.  <u>See</u> <u>Taylor</u> 985 F.2d at 6 ("the issuing magistrate properly may credit the experience and

pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi."); See also Soule, 908 F.2d at 1040; Thus, Burns' conclusion of probable cause must also advise the magistrate's decision to issue a search warrant.

In addition to probable cause to seize the physical evidence recovered from his apartment, the seizure was justified by valid consent.  Knowles consented to the search when he told the officers to "look wherever you want."  The Miranda warnings were given to Knowles before he consented to the search, putting him on notice that he could refuse to cooperate supporting a finding of voluntary consent.  See United States v. Luciano, 329 F.3d 1, 7-9 (1st Cir. 2003); United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993); cf. Bumper v. North Carolina, 391 U.S. 543, 548 (1968)(consent involuntary when officers relied on nothing more than baseless claim of authority).  The presence of probable cause to seek a search warrant does not necessarily render consent involuntary.  United States v. Lee, 317 F.3d 26, 33 (1st Cir. 2003).  Knowles' extensive criminal history minimized the chance that he was intimidated by the officers' show of force, causing him to acquiesce.  Barnett, 989 F.2d at 555-56 quoting United States v. Cepulonis, 530 F.2d 238, 244 (1st Cir. 1976).  There is no evidence that Knowles' will was overborne, or his "capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).

Furthermore, Knowles gave implicit consent to search the small safe recovered under his bed by claiming ownership, pointing out a key on his dresser, indicating the key might open the safe. United States v. Mendoza-Gonzalez, 318 F.3d 663, 667-70 (5th Cir. 2003)(consent implied because defendant did not object to agents' opening of sealed boxes inside trailer); United States v. Zapata, 18 F.3d 971, 977 (1st Cir.1994) (Evidence of consent inferable from conduct) citing Schneckloth v. Bustamonte, Id.; Robbins v. MacKenzie, 364 F.2d 45, 48 (1st Cir. 1966) cert. denied, 385 U.S. 913 (1966) (same); See also United States v. Gordon, 173 F.3d 761, 765-66 (10th Cir. 1999) (consent to search a locked duffle bag implied because defendant removed the key from his pocket and gave it to officer in response to question "can you open that?").

## 2.   The Defendant Made A Valid Waiver Of Miranda

The Defendant's statements are admissible because he made a knowing, voluntary, and intelligent, wavier of his rights. Miranda v. Arizona, 384 U.S. 436, 475 (1966).  To prove a valid waiver, the government must show that (1) the waiver represented an "uncoerced choice;" and (2) the defendant understood both the nature of the right being waived and the consequences of waiver. See Moran v. Burbine, 475 U.S. 412, 421 (1986).

The evidence will show that Knowles, 44 years old at the time of his arrest, was sufficiently intelligent and educated,

22

experienced with criminal matters, and in sound physical and mental condition, to understand and voluntarily waive his rights. Knowles received Miranda warnings at least four times, waived them each time, either explicitly or implicitly, and never intimated his desire to assert his rights.

Sergeant Burns verbally informed the Defendant of his Miranda rights on two separate occasions at Knowles' apartment. After Burns informed Knowles of his rights for the second time, Knowles stated, "I know my rights and I don't need no fucking piece of shit lawyer!" Although that statement does not necessarily establish the truth of the matter asserted, in light of that statement, it is ludicrous for the Defendant to now state that he intended to assert Miranda rights. Bui v. DiPaolo, 170 F.3d 232, 240 (1st Cir. 1999). In addition, Knowles implicitly waived his rights by, after receiving repeated Miranda warnings, spontaneously recommencing his dialogue with Burns. Bui, supra, citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Officer Melnick also advised Knowles of his Miranda warnings during the booking procedure at the Palmer Police Station, and finally, Burns obtained a written waiver from Knowles approximately three hours after his arrest. Burns will testify how, in addition to Knowles' assurance that he understood his rights, it appeared to Burns that Knowles understood them each time Burns advised him.

Knowles' extensive criminal record demonstrated his

awareness of the rights he chose to forfeit by speaking with the officers. <u>United States v. Palmer</u>, 203 F.3d 55, 61 (1st Cir. 2000) (valid waiver in part because defendant had 16 prior arrests). His criminal record also minimizes the chance that Knowles was under undue coercion, caused by the presence of multiple police officers. <u>See</u> <u>Barnett</u>, 989 F.2d at 555-56.

The Defendant's assertion that he received nothing in discovery to show that the Defendant received Miranda warnings at his apartment is incorrect. The government provided timely discovery that Burns provided Miranda warnings to the Defendant twice at his apartment.[5] More importantly, there is no requirement that either the warnings be provided in writing, or that a defendant must explicitly waive the warnings. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373-76 (1979)(explicit waiver not necessary to show defendant waived right to remain silent because defendant volunteered incriminating statements); <u>Bui</u>, 170 F.3d ay 238 citing <u>United States v. Garcia</u>, 93 F.2d 1160, 1169 (1st Cir. 1993).

Finally, Knowles made his statements during and after a lawful search of, and seizure of evidence from, the Defendant's apartment, thus they should not be suppressed as the fruits of the poisonous tree. <u>Wong Sun v. United States</u>, 371 U.S. 471, 487-88 (1963). In addition, Knowles' written statement provided

---

[5] See Government's Automatic Discovery Letter, listing Burns' report, attached as <u>Government Exhibit B</u>).

to Burns, more than three hours after his arrest, was
sufficiently attenuated from the seizure so as to fall outside
the scope of the "fruit of the poisonous tree" doctrine.  Id.

## CONCLUSION

For these reasons, the government respectfully requests the
Court to deny the Defendant's motions.

> Respectfully submitted,
>
> MICHAEL J. SULLIVAN
> United States Attorney
>
> By:  s/ Paul Hart Smyth
> _____
> Paul Hart Smyth
> Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

    I, Paul Hart Smyth, Assistant U.S. Attorney, do hereby
certify that I have served a copy of the foregoing, via U.S.
Mail, to counsel of record, Attorney Alan Black, on January 3,
2004.

                                S/ Paul Hart Smyth
                                PAUL HART SMYTH
                                Assistant U.S. Attorney

January 2, 2004